Judgment Appealed From Is: Affirmed
DECISION.
Plaintiff-appellant Bascon, Inc., is a design and construction firm that provides services for industrial and aviation markets throughout the United States and in several foreign countries. Bascon, formed in 1986, is currently owned by Stephen Tamanko, Alex Beke, and Tamanko's two sons; however, defendant-appellee William de la Vega was one of Bascon's founders and the owner of 22 2/3 shares of the corporation's stock.
In 1994, de la Vega, Tamanko, and Beke entered into a stock-redemption agreement, which set forth terms and conditions for the redemption of shares should any one of them decide to resign or retire. The agreement provided a formula for determining the price Bascon would pay for the redeemed shares. A portion of that formula included a means for determining the fair-market value of the stock by factoring in the expected margin, or revenue, from existing projects. The agreement permitted Bascon to purchase the stock all at once, or to pay half of the purchase price within sixty days of the shareholder's redemption and the balance over the course of twelve months.
On October 8, 1995, de la Vega announced his resignation from Bascon. Consequently, Bascon retained an accountant to determine the fair-market value of de la Vega's stock. On November 10, 1995, de la Vega entered into a stock-purchase agreement with Bascon that used the stock-redemption agreement's fair-market-value analysis of the stock and set forth an installment plan that differed slightly from the plan set forth in Bascon's stock-redemption agreement.
At the time the stock-purchase agreement was entered into, the fair-market value of de la Vega's stock was calculated to be $557,000. Bascon and de la Vega agreed that de la Vega would receive three installments. In the first, de la Vega would receive $250,000 when he left Bascon, followed by $250,000 within sixty days, and a final payment of $57,000 on June 30, 1996. To ensure that de la Vega would receive his second and third installments, Bascon gave two promissory notes to de la Vega, one for $250,000 and one for $57,000. Since Bascon and de la Vega contemplated that the fair-market value of de la Vega's stock might fluctuate due to changes in the margin on Bascon's outstanding projects, they agreed that the final installment could be adjusted to represent accurately the gross margin as of the due date for the final promissory note, June 30, 1996. This agreement was reflected in both the stock-purchase agreement and more specifically in the $57,000 promissory note.
As the final installment date approached, Bascon was having difficulties with two large projects. Tamanko and de la Vega spoke about these difficulties and agreed orally to extend the installment date. Tamanko then sent a proposed stock-purchase-agreement addendum to de la Vega to memorialize the change; however, de la Vega never acknowledged the terms of the addendum other than agreeing to extend the installment date. That date was extended several more times by Bascon, with the final installment date set for July 1, 1998.
On that date, the fair-market value of de la Vega's shares was determined by Bascon to be only $262,457. Bascon relayed this information to de la Vega and demanded that de la Vega pay Bascon $237,543, which Bascon claimed it had overpaid de la Vega for his stock. In addition, Bascon claimed that it no longer owed de la Vega anything on the promissory note for $57,000. De la Vega refused to pay Bascon, and Bascon filed suit against de la Vega, seeking payment.
The trial court found that the general terms of the stock-purchase agreement gave way to the specific terms set forth in the promissory note regarding any amount owed to either Bascon or de la Vega upon the due date of the final installment. The trial court also found that the stock-purchase agreement accurately determined the value of de la Vega's stock, and that Bascon and de la Vega had contemplated only that the final installment could be adjusted based upon the reconciliation of the Bascon projects still in progress. Based upon these findings, the trial court ruled that Bascon owed de la Vega nothing on the $57,000 note and that de la Vega was not, under the unambiguous terms of the stock-purchase agreement, required to reimburse Bascon for $237,543.
Bascon now appeals to this court, claiming that the trial court erred in failing to grant judgment in its favor for the full amount owed by de la Vega. We disagree because the record contains competent and credible evidence to support the trial court's judgment. See Seasons Coal Co., Inc., v. Cleveland
(1984), 10 Ohio St.3d 77, 461 N.E.2d 1273; C.E. Morris Co. v.Foley Constr. Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578.
Courts examine contracts in order to interpret and enforce the intended result of the parties. See Foster Wheeler Enviresponse,Inc. v. Franklin Co. Convention Facilities Auth. (1997), 78 Ohio St.3d 353,678 N.E.2d 519; Aultman Hosp. Assn. v. Community Mut.Ins. Co. (1989), 46 Ohio St.3d 51, 544 N.E.2d 920; United StatesFid. Guar. Co. v. St. Elizabeth Med. Ctr. (1999), 129 Ohio App.3d 45,55, 716 N.E.2d 1201, 1208. It must be presumed that the contractual language chosen by the contracting parties expresses clearly the intent of those parties. See Shifrin v. Forest City Enterprises, Inc.
(1992), 64 Ohio St.3d 635, 597 N.E.2d 499; Kelly v. Med.Life Ins. Co. (1987), 31 Ohio St.3d 130, 509 N.E.2d 411. If contractual terms are unambiguous, a court may not fashion a new contract or interpret contractual terms in a manner inconsistent with the clear intent of the parties. See Alexander v. Buckeye Pipe LineCo. (1978), 53 Ohio St.2d 241, 374 N.E.2d 146. But when unambiguous provisions within a contract conflict, the court must look to the entire contract to ascertain the intent of the parties. SeeFord Motor Co. v. John L. Frazier Sons Co. (1964), 8 Ohio App.2d 158,196 N.E.2d 335; United States Fid. Guar. Co., supra. The provision that is deemed to contribute most to the intent of the parties controls over a conflicting provision. See id. Despite this, courts must "attempt to give effect to each and every part of [the contract], * * * and avoid any interpretation of one part which will annul another part." Foster Wheeler Enviresponse, Inc., at 363,678 N.E.2d at 527, citing Legler v. United States Fid. Guar. Co.
(1913), 88 Ohio St. 336, 103 N.E. 897; Farmers Natl. Bank v.Delaware Ins. Co. (1911), 83 Ohio St. 309, 94 N.E. 834. Under this framework of contract interpretation, courts may interpret an unambiguous, yet doubtful, provision so as to give it meaning and purpose when any other interpretation would render the provision meaningless. See Foster Wheeler Enviresponse, Inc., at 362,678 N.E.2d at 526, citing Farmers Natl. Bank, supra, at paragraph six of the syllabus.
Although the trial court applied the doctrine of ejusdem generis to give effect to the specific provisions of the promissory note over the provisions in paragraph 4 of the stock-purchase agreement, we do not believe that doctrine applies in this case, because the special provisions noted by the trial court did not immediately precede the general provisions. Furthermore, the trial court found that the contract must be construed strictly against the drafter; however, that principal of contract law does not apply unless there is ambiguity in the contract. See FarmersNatl. Bank, supra. Since the court correctly found that the provisions at issue in this contract were in conflict and not ambiguous, the contract provisions should not have been strictly construed against Bascon, but, instead, should have been harmonized to give full effect to the intent of the parties.
The contract at issue in this case consisted of both the stock-purchase agreement and the promissory notes. Paragraph 2(C) of the stock-purchase agreement stated unambiguously that the principal amount due and payable under the $57,000 promissory note could be increased or decreased by the parties based upon adjustments in paragraph 3. Paragraph 3 stated that the final stock-purchase price would be based upon projected margins of certain jobs in progress, and that only the $57,000 promissory note could "be increased or decreased, based upon the difference between such current projected gross margins and such later projected gross margins" at the time it was due. No provision in either paragraph 2(C) or paragraph 3 referred to a repayment by de la Vega of any amount from the prior installments.
In paragraph 4 of the stock-purchase agreement, there existed, consistent with paragraphs 2(C) and 3, a provision for adjusting only the final value of the $57,000 promissory note based upon the final determination of the profit margin on the outstanding projects. This language was reflected only within the provisions of the $57,000 promissory note and not within the other promissory note given to de la Vega at the time the stock-purchase agreement was entered into.
Also set forth in paragraph 4, subsequent to the language that allowed the adjustment of the $57,000 promissory note, was the following:
 In the event the combined total of the adjusted profit margins and if Stockholder elects, the purchase price of the life insurance policy(s) referred to the paragraph 2.B.ii results in a negative figure, Stockholder shall reimburse Corporation for the overpayment he would have received by then plus the costs of such life insurance policy(s).
Bascon argues that it was this provision that demanded a refund from de la Vega if the recalculated fair-market value of de la Vega's stock ended up to be less than the $500,000 already paid to de la Vega. To begin with, this provision is not grammatically correct and refers to a nonexistent paragraph — the life insurance policy purchase provisions are set forth in paragraph 2(C)(ii) of the stock-purchase agreement. This provision is not ambiguous in its meaning, because it requires that de la Vega reimburse Bascon for any overpayment if the final stock value plus the cost of the life insurance policy is less than zero. This provision, however, obviously conflicts with other provisions within the same paragraph, provisions set forth in paragraphs 2(C) and 3 of the stock-purchase agreement, and the provisions of the $57,000 promissory note. We hold that although this provision is unambiguous on its face, it is doubtful in its meaning and must, therefore, be harmonized with the remaining terms of the contract in order to give it a meaningful purpose and effect.
Tamanko testified that there was some concern that the $57,000 held back in the final note would not be enough to cover a larger fluctuation in the final stock value, and that this was the reason for the reimbursement provision in paragraph 4. His testimony was clearly based upon a self-serving, oral representation purportedly made prior to the execution of the stock-purchase agreement that attempted to vary or contradict the written provisions of paragraph 4. Therefore, since this evidence should have been excluded based upon the parol-evidence rule, see AmeriTrust Co. v.Murray (1984), 20 Ohio App.3d 333, 486 N.E.2d 180, we do not afford it weight in our interpretation of paragraph 4.
Tamanko's other trial testimony reveals that the parties never anticipated that the margin on the outstanding projects would be less than $57,000. In fact, Tamanko testified that there was speculation that the principal amount of the final note should have been increased. Bascon never contemplated that de la Vega's stock value would result in him owing over $57,000 to Bascon. We believe that had Bascon wanted de la Vega to refund money that had already been paid to him, Bascon would have inserted a clear and unambiguous provision to that effect in the stock-purchase agreement.
Another interpretation of the disputed provision, one that was not addressed by the trial court, comes from reviewing all of paragraph 4. The first provision of paragraph 4 stated that the principal amount on the final promissory note could be adjustedupon agreement of the parties. By implication, the remaining portion of paragraph 4 dealt with a situation in which the parties did not agree to the adjusted principal amount. In this circumstance, payment on the note would have been made to de la Vega, who would then have "reimburse[d] Corporation for the overpayment he would have received by then" up to the face value of the note. This harmonizing interpretation of paragraph 4 gives full meaning and effect to all provisions of the contract and the intent of the parties, which was to compensate de la Vega for the stock he transferred to Bascon on November 10, 1995.
The findings made by the trial court — that only the final promissory note could be adjusted and that de la Vega was not liable to repay any amounts already received for his stock — are supported by the evidence. Although the legal reasoning of the trial court differs somewhat from how this court has interpreted the stock-purchase agreement, the result is the same. Therefore, we overrule Bascon's assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
 Gorman, P.J., and Sundermann, J., concur.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Decision.